## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

Phoenix Entertainment Partners, LLC,
    Plaintiff,

v.

Herbert J. Boyte Jr.; Jodie Boyte;
William Knights; Hunter's Pub, Inc.;
Who's Bar My Bar LLC; Pelton's
Catering Inc.; C & Yuan Company
Inc.; Dennis Lee Locke d/b/a Lynn's
Longbranch; Lara's LPA, LLC;
Nampaw LLC; and Back Den L.P.,
    Defendants.

Case No. 4:16-cv-2911

## COMPLAINT

The Plaintiff, Phoenix Entertainment Partners, LLC ("Phoenix"), by its

counsel, complains of the Defendants, and for its Complaint alleges as follows:

## JURISDICTION OF THE COURT

1.    This is an action for copyright infringement and trademark

infringement in which the Defendants stand accused, variously, of making copies of

and distributing karaoke accompaniment tracks, which tracks are the subject of

Phoenix's copyright; and of supplying customers and patrons with karaoke

accompaniment tracks marked with Phoenix's federally registered trademarks and

providing karaoke entertainment services in connection with Phoenix's federally registered trademarks; all without authorization.

2.      This action arises under §§ 32 and 43 of the Trademark Act of 1946, 15 U.S.C. §§ 1114 and 1125, as amended, as to the trademark infringement and unfair competition claims; and under § 501 of the Copyright Act of 1976, as amended, 17 U.S.C. § 501, as to the copyright infringement claims.

3.      This Court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

4.      This Court further has jurisdiction pursuant to 28 U.S.C. § 1338(a), in that this civil action arises under acts of Congress relating to trademarks and copyrights, and, as to the Plaintiff's federal unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark and copyright laws of the United States.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because all of the Defendants reside in this State and judicial district.

6.      This Court has personal jurisdiction over each of the Defendants, based upon the Defendants' residence in this State and judicial district and conduct of significant business here, and in that the acts of which the Defendants stand accused were undertaken in this State and judicial district.

- 2 -

## THE PLAINTIFF

7.      Phoenix is a North Carolina limited liability company having its principal place of business in Pineville, North Carolina.

## THE DEFENDANTS

8.      Defendants Herbert J. Boyte Jr. and Jodie Boyte (together, "the Boytes") are individuals who together operate a mobile entertainment business under the business name Karaoke Houston, at least one purpose of which is to provide karaoke-related services.

9.      Defendant William Knights ("Knights") is an individual who operates a mobile entertainment business under the business name Mr. Karaoke, at least one purpose of which is to provide karaoke-related services.

10.      Defendant Hunter's Pub, Inc. ("Hunter's Pub") is a Texas corporation that operates an eating and drinking establishment under its own name in Houston, Texas, at which karaoke entertainment is provided.

11.      Defendant Who's Bar My Bar LLC ("My Bar") is a Texas limited liability company that operates an eating and drinking establishment under the trade name My Bar in Houston, Texas, at which karaoke entertainment is provided.

12.     Defendant Pelton's Catering Inc. ("Pelton's") is a Texas corporation that operates an eating and drinking establishment under the trade name Cozy Corner in Houston, Texas, at which karaoke entertainment is provided.

13.     Defendant C & Yuan Company Inc. ("C & Yuan") is a Texas corporation that operates an eating and drinking establishment under the trade name Club Max in Houston, Texas, at which karaoke entertainment is provided.

14.     Defendant Dennis Lee Locke ("Locke") is an individual who operates an eating and drinking establishment under the trade name Lynn's Longbranch in Houston, Texas, at which karaoke entertainment is provided.

15.     Defendant Lara's LPA, LLC ("Lara's") is a Texas limited liability company that operates an eating and drinking establishment under the trade name Gridiron Bar & Grill in Sugar Land, Texas, at which karaoke entertainment is provided.

16.     Defendant Nampaw LLC ("Nampaw") is a Texas limited liability company that operates an eating and drinking establishment under the trade name Ashford Pub in Houston, Texas, at which karaoke entertainment is provided.

17.     Defendant Back Den L.P. ("Den") is a Texas limited partnership that operates an eating and drinking establishment under the trade name The Den in Houston, Texas, at which karaoke entertainment is provided.

18.    Together, Hunter's Pub, My Bar, Pelton's C & Yuan, Locke, Lara's, Nampaw, and Den are referred to herein as "the Venue Defendants."

19.    Defendants Hunter's Pub, My Bar, Pelton's, C & Yuan, and Locke are each joined in this action with the Boytes because the claims against each arise from the same series of transactions or occurrences, to wit: a weekly series of karaoke shows hosted by the Boytes and Karaoke Houston at each of those establishments.

20.    Defendants C & Yuan, Lara's, Nampaw, and Den are each joined in this action with Knights because the claims against each arise from the same series of transactions or occurrences, to wit: a weekly series of karaoke shows hosted by the Knights at each of those establishments.

21.    The Boytes and Knights are joined in this action because the claims against them arise, in part, from the same series of transactions or occurrences, to wit, a series of weekly karaoke shows hosted by the Boytes and by Knights, during the same time period, at C & Yuan's establishment.

22.    As detailed below, there are questions of fact and law at issue in this action that are common to each of the Defendants, including without limitation, facts regarding the manner and method of infringement that each of them has committed and the scope and nature of the intellectual property rights each has infringed, as well as the commonality of at least the trademark-related claims to all defendants.

## BACKGROUND FACTS

23.     Karaoke is a popular form of participatory entertainment commonly found in bars and restaurants and other types of venues throughout the United States.

24.     The basic premise of a karaoke show is that the venue hosting the show provides patrons with access to a sound system and specially prepared karaoke accompaniment tracks, so that individual patrons may perform for the crowd.

25.     Generally, a "karaoke accompaniment track" is an audiovisual work comprising a re-recorded version of a popular song without the lead vocals synchronized to a graphical component containing a lyric display, cueing information, and other information.

26.     When a karaoke accompaniment track is publicly performed, the graphical component is displayed to the patron who is performing and may be displayed to the crowd as well.

27.     Venues that offer karaoke entertainment, including some of the Defendants, do so as part of a commercial transaction wherein the venues supply their patrons with access to karaoke tracks and karaoke entertainment services in exchange for their patronage of the establishment and, they hope and expect, the purchase of food and beverages.

28.    The purchase and consumption of alcoholic beverages in connection with karaoke shows is particularly encouraged to enable patrons to overcome inhibitions against singing in public.

29.    Most venues that offer karaoke entertainment hire mobile entertainment operators to provide the karaoke tracks and the karaoke entertainment services on the venues' behalf.

30.    Phoenix is the owner of SOUND CHOICE®, a well-known and leading brand of karaoke accompaniment tracks that is particularly well known to commercial karaoke operations including bars, restaurants, and other venues as described above.

31.    Over the course of nearly three decades in business, Slep-Tone Entertainment Corporation ("Slep-Tone"), Phoenix's predecessor in interest re-recorded and released in excess of 16,500 SOUND CHOICE-branded popular songs on special compact discs known as CD+G ("compact disc plus graphics") discs and, more recently, a subset of that catalog in another common karaoke format, MP3+G ("MP3 plus graphics") on compact discs.

32.    Phoenix is also the owner of copyright in numerous karaoke accompaniment tracks by virtue of an assignment of rights from Slep-Tone in 2015.

33.    SOUND CHOICE-branded karaoke tracks are wildly popular among karaoke entertainment providers, patrons, and home consumers.  According to some

estimates, as corroborated by investigative data, more than half of all accompaniment tracks played at karaoke shows in the United States originated from Slep-Tone's recordings.

34.    The popularity of SOUND CHOICE karaoke tracks derives from the market's perception that the recordings are usually the most faithful to the sound of the original recording artist, a characteristic highly valued by karaoke singers.

35.    SOUND CHOICE karaoke tracks are also perceived by the market as providing highly accurate singing cues as part of the video display, a characteristic that is also highly valued by karaoke singers.

36.    Slep-Tone and its successor Phoenix have released their karaoke tracks for commercial users <u>only</u> on compact discs[1] and not on any other form of carrier (such as computer hard drives or through internet downloads).

37.    Over time, however, it has become technologically possible to create karaoke accompaniment tracks, using the SOUND CHOICE CD-based tracks as a template, for storage on alternative media, such as computer hard drives.

38.    In most cases, the creation of such non-original tracks results in an imitation of a SOUND CHOICE track, which imitation is degraded from and inferior

---

[1] In the beginning, Slep-Tone released its karaoke tracks on cassette tapes as well, but that technology was focused on the home consumer and has since become fully obsolete.

to the original because of digital compression of the data as the format is converted from native CD+G audio and graphics to compressed audio and graphics.

39.     The process outlined above is known as "media-shifting," because the information is being copied from one medium to another, and "format-shifting," because the information is being modified from one format to another for use on a different medium.

40.     These media-shifting and format-shifting activities involve a substantial reduction in the quality of the audiovisual works, because the formats used require the use of compressed audio in the resulting tracks.

41.     These media-shifting and format-shifting activities also usually result in the placement of the SOUND CHOICE brand upon the resulting non-original, new tracks.

42.     Easy electronic duplication of media-shifted tracks has resulted in the widespread copying and distribution of SOUND CHOICE-branded karaoke tracks unaccompanied by the acquisition of any discs at all.

43.     This distribution allows karaoke accompaniment track users to gain the benefit of using SOUND CHOICE-branded karaoke tracks without paying for original discs.

44.     Karaoke accompaniment track users have used the available technology to place the duplicated contents of one purchased disc on two or more computer

systems for simultaneous use; to place the duplicated contents of their patrons' discs on their own computer hard drives at a show; to "swap" song files with other users; to obtain and share karaoke tracks via file-sharing sites and torrents; to purchase computer hard drives that were pre-loaded with duplicates of karaoke tracks; and to sell any original media they might have owned in the secondary market once they have media-shifted.

45.    To the extent that the Defendants, particularly including the Boytes and Knights, have undertaken any of the activities described in the preceding paragraph, those activities have been undertaken wholly without any form of permission from or payment to Phoenix.

## THE RIGHTS OF THE PLAINTIFF

46.    Phoenix is the owner of copyright in the audiovisual works listed in Annex A hereto ("the Copyrights"), by virtue of an assignment instrument from Slep-Tone dated February 15, 2015.

47.    Each of the claims of copyright in the audiovisual works was registered with the United States Copyright Office prior to the commencement of this action and prior to the discovery by Phoenix of the Defendants' acts of copyright infringement.

48.    The audiovisual works are the subject of separate copyright from the copyright in the underlying musical compositions they embody.

49.    Phoenix is the owner of the federal trademark and service mark registrations listed in Annex B hereto ("the Sound Choice Marks"), by virtue of an assignment instrument from Slep-Tone dated February 15, 2015.

50.    Slep-Tone acquired its rights in the Sound Choice Marks by virtue of its registrations based on use of the marks (a) by applying the Sound Choice Marks to goods, which goods were then sold and transported in interstate commerce, and (b) in connection with the advertising and performance of karaoke entertainment services, either directly or by related companies that include hundreds of controlled licensees.

51.    Phoenix is also the sole owner of Sound Choice Entertainment, LLC, a Texas limited liability company ("SCE") that is engaged in the business of providing karaoke entertainment services to venues in various locations around the United States, including within Texas.

52.    Phoenix and its predecessor have, for the entire time the Sound Choice Marks have been federally registered, provided the public, including the Defendant, with notice of those federal registrations through the consistent application of the symbol ® to its marks on goods and in connection with services, when appropriate.

- 11 -

53.     Principally, the Sound Choice Marks are indicators of Phoenix as the origin of physical karaoke accompaniment tracks that have been marked with the Sound Choice Marks and of karaoke entertainment services provided in connection with the Sound Choice Marks.

## THE ACTIVITIES OF THE DEFENDANTS

**A.     The Boytes**

54.     The Boytes operate a mobile entertainment business, Karaoke Houston, through which they supply karaoke accompaniment tracks and provide karaoke entertainment services to their venue customers and other customers.

55.     In order to supply karaoke accompaniment tracks to a venue, the Boytes or a person in their employ transports the karaoke accompaniment tracks to the venue.

56.     In order to obtain the infringing karaoke tracks or to supply them to a venue, the infringing karaoke tracks are transported in commerce, using computer networks and/or public roadways.

57.     The Boytes use computer software to access and play the karaoke accompaniment tracks upon a request by a patron to sing the song represented by the track.

58.     A substantial number—the exact number of which will be ascertained through discovery—of the karaoke accompaniment tracks the Boytes supply to the venue are marked with the Sound Choice Marks and are specifically identified in their computer systems, by name or other symbol, as SOUND CHOICE tracks.

59.     The physical tracks so marked and so supplied to the venue were not made by Phoenix or under its direction or control.

60.     The Boytes did not have Phoenix's permission to mark any karaoke accompaniment tracks with the Sound Choice Marks or to make any karaoke accompaniment tracks marked with the Sound Choice Marks.

61.     The karaoke accompaniment tracks that the Boytes supplied to the venues and that were marked with the Sound Choice Marks were and are counterfeit.

62.     Upon information and belief, the Boytes have created or have caused to be created at least four separate karaoke systems, each of which is supplied with a virtually identical set of karaoke accompaniment tracks.

63.     The Boytes were and are paid by each of their venue customers to supply the karaoke accompaniment tracks so marked.

64.     In order to supply karaoke entertainment services to a venue, the Boytes prepare and execute a karaoke show, either themselves or through one or more persons in their employ, by acquiring, or acquiring access to, appropriate sound equipment for playing karaoke accompaniment tracks; connecting the sound

equipment to a source for karaoke accompaniment tracks (to wit, the tracks supplied as indicated above); causing selected karaoke accompaniment tracks to be played over the sound equipment; controlling the organization and flow of the performances; and acting as the on-microphone emcee of the show.

65.     During the course of supplying these karaoke entertainment services, the Boytes repeatedly display the Sound Choice Marks in connection with the services.

66.     Because of the well-known association of the Sound Choice Marks with karaoke entertainment services, the display of the Sound Choice Marks in connection with the services, regardless of the particular song being played, acts as a general advertisement for the services as well as an indicator of the quality of the services being provided.

67.     Because of the frequent, repeated display of the Sound Choice Marks across numerous instances of widely disparate songs, patrons and other consumers of the Boytes' karaoke entertainment services are likely to view the display of the Sound Choice Marks as an indicator of the affiliation, connection, or association of the Boytes and of Karaoke Houston with Phoenix, or of Phoenix's sponsorship or approval of their services and related commercial activities, rather than merely as the creator of the underlying communicative content of any particular song being performed.

- 14 -

68.     The foregoing activities undertaken in connection with the Sound Choice Marks were undertaken in derogation of Phoenix's rights in the Sound Choice Marks.

69.     Consumers of the Boytes' goods and services are likely to be confused regarding the origin or sponsorship of the goods in use and regarding the affiliation or connection of the Boytes and of Karaoke Houston with Phoenix, based on their mistaken belief that the goods being supplied were made by Phoenix and that the services being provided are provided with Phoenix's knowledge and approval.

70.     As a result of those activities, Phoenix has been damaged through the loss of revenues associated with the sale or licensing of legitimate goods and services, as well as through the loss of Phoenix's ability to control the quality of goods marked and services provided in connection with the Sound Choice Marks.

71.     Upon information and belief, the karaoke accompaniment tracks the Boytes supplied to their venue customers included copies of the audiovisual works identified in Annex A, the copyright in which belongs to Phoenix.

72.     Upon information and belief, the Boytes have conducted similar infringing activities with respect to numerous other tracks in which Phoenix owns the copyright, and Phoenix believes that discovery in this matter will reveal those activities as well as the unauthorized public performance of tracks belonging to Phoenix.

73.     The Boytes did not have Phoenix's permission to make or acquire the copies or to distribute the copies to the venue customers.

74.     The Boytes' acts of reproduction and distribution were undertaken in derogation of Phoenix's exclusive rights in those audiovisual works.

75.     As a result of those unauthorized acts of reproduction, distribution, and public performance, Phoenix has been damaged.

**B.     Defendant Knights**

76.     Defendant Knights operates a mobile entertainment business, Mr. Karaoke, through which he supplies karaoke accompaniment tracks and provides karaoke entertainment services to his venue customers and other customers.

77.     In order to supply karaoke accompaniment tracks to a venue, Defendant Knights transports the karaoke accompaniment tracks to the venue.

78.     In order to obtain the infringing karaoke tracks or to supply them to a venue, the infringing karaoke tracks are transported in commerce, using computer networks and/or public roadways.

79.     Defendant Knights uses computer software to access and play the karaoke accompaniment tracks upon a request by a patron to sing the song represented by the track.

80.    A substantial number—the exact number of which will be ascertained through discovery—of the karaoke accompaniment tracks Defendant Knights supplies to the venue are marked with the Sound Choice Marks and are specifically identified in his computer system, by name or other symbol, as SOUND CHOICE tracks.

81.    The physical tracks so marked and so supplied to the venue were not made by Phoenix or under its direction or control.

82.    Defendant Knights did not have Phoenix's permission to mark any karaoke accompaniment tracks with the Sound Choice Marks or to make any karaoke accompaniment tracks marked with the Sound Choice Marks.

83.    The karaoke accompaniment tracks that Defendant Knights supplied to the venues and that were marked with the Sound Choice Marks were and are counterfeit.

84.    Defendant Knights was and is paid by each of his venue customers to supply the karaoke accompaniment tracks so marked.

85.    In order to supply karaoke entertainment services to a venue, Defendant Knights prepares and executes a karaoke show by acquiring, or acquiring access to, appropriate sound equipment for playing karaoke accompaniment tracks; connecting the sound equipment to a source for karaoke accompaniment tracks (to wit, the tracks supplied as indicated above); causing selected karaoke accompaniment tracks to be

played over the sound equipment; controlling the organization and flow of the performances; and acting as the on-microphone emcee of the show.

86.    During the course of supplying these karaoke entertainment services, Defendant Knights repeatedly displays the Sound Choice Marks in connection with the services.

87.    Because of the well-known association of the Sound Choice Marks with karaoke entertainment services, the display of the Sound Choice Marks in connection with the services, regardless of the particular song being played, acts as a general advertisement for the services as well as an indicator of the quality of the services being provided.

88.    Because of the frequent, repeated display of the Sound Choice Marks across numerous instances of widely disparate songs, patrons and other consumers of Defendant Knights 'karaoke entertainment services are likely to view the display of the Sound Choice Marks as an indicator of the affiliation, connection, or association of Defendant Knights and his Mr. Karaoke business with Phoenix, or of Phoenix's sponsorship or approval of his services and related commercial activities, rather than merely as the creator of the underlying communicative content of any particular song being performed.

89.     The foregoing activities undertaken in connection with the Sound Choice Marks were undertaken in derogation of Phoenix's rights in the Sound Choice Marks.

90.     Consumers of Defendant Knights' goods and services are likely to be confused regarding the origin or sponsorship of the goods in use and regarding the affiliation or connection of Defendant Knights and his Mr. Karaoke business with Phoenix, based on their mistaken belief that the goods being supplied were made by Phoenix and that the services being provided are provided with Phoenix's knowledge and approval.

91.     As a result of those activities, Phoenix has been damaged through the loss of revenues associated with the sale or licensing of legitimate goods and services, as well as through the loss of Phoenix's ability to control the quality of goods marked and services provided in connection with the Sound Choice Marks.

92.     Although Phoenix has not yet identified any specific instances of copyright infringement by Defendant Knights, Phoenix's investigation is ongoing, and it will seek leave to amend this Complaint to assert claims of copyright infringement if appropriate.

C.    **The Venue Defendants**

93.    Venue Defendants Hunter's Pub, My Bar, Pelton's, C & Yuan, Locke, Lara's, Nampaw, and Den each host karaoke shows comprising karaoke entertainment services at their respective establishments.

94.    At these karaoke shows, the Venue Defendants supply karaoke accompaniment tracks to their patrons by contracting with a third party operator as their agent for doing so.

95.    Specifically, Hunter's Pub, My Bar, Pelton's, C & Yuan, and Locke have contracted with the Boytes for that purpose, while C & Yuan, Lara's, Nampaw, and Den have contracted with Knights for that purpose.

96.    The Venue Defendants each induce their respective third-party agent to transport the karaoke accompaniment tracks to the venue.

97.    A substantial number—the exact number of which will be ascertained through discovery—of the karaoke accompaniment tracks the Venue Defendants supply to their patrons are marked with the Sound Choice Marks and are specifically identified in the computer system that contains them, by name or other symbol, as SOUND CHOICE tracks.

98.    The physical tracks so marked and so supplied were not made by Phoenix or under its direction or control.

99.    The Venue Defendants did not have Phoenix's permission to mark any karaoke accompaniment tracks with the Sound Choice Marks; to make any karaoke accompaniment tracks marked with the Sound Choice Marks; or to induce, authorize, or otherwise arrange for any third party to do so.

100.   At the karaoke shows, the karaoke accompaniment tracks supplied to the Venue Defendants' patrons are played upon the patrons' requests, so that the patrons may sing along for entertainment purposes.

101.   The karaoke accompaniment tracks that the Venue Defendants supplied to their patrons (through their respective third-party agent) and that were marked with the Sound Choice Marks were and are counterfeit.

102.   As the patrons are supplied with karaoke entertainment services, the Sound Choice Marks are repeatedly displayed in connection with the services.

103.   Because of the well-known association of the Sound Choice Marks with karaoke entertainment services, the display of the Sound Choice Marks in connection with the services, regardless of the particular song being played, acts as a general advertisement for the services as well as an indicator of the quality of the services being provided.

104.   Because of the frequent, repeated display of the Sound Choice Marks across numerous instances of widely disparate songs, patrons who receiveeach of the Venue Defendants' karaoke entertainment services are likely to view the display

of the Sound Choice Marks as an indicator of the affiliation, connection, or association of that Venue Defendant with Phoenix, or of Phoenix's sponsorship or approval of the services and related commercial activities, rather than merely as indicating Phoenix as the creator of the underlying communicative content of any particular song being performed.

105.   The foregoing activities undertaken in connection with the Sound Choice Marks were undertaken in derogation of Phoenix's rights in the Sound Choice Marks.

106.   The Venue Defendants' patrons are likely to be confused regarding the origin or sponsorship of the goods being supplied and regarding the affiliation or connection of that Venue Defendant with Phoenix, based on their mistaken belief that the goods being supplied were made by Phoenix and that the services being provided are provided with Phoenix's knowledge and approval.

107.   As a result of those activities, Phoenix has been damaged through the loss of revenues associated with the sale or licensing of legitimate goods and services, as well as through the loss of Phoenix's ability to control the quality of goods marked and services provided in connection with the Sound Choice Marks.

108.   The supplying of the tracks and the provision of the services are an essential part of a commercial transaction wherein the patrons purchase food and beverages and receive access to the tracks and to the services in connection with

their patronage, even if the patrons do not directly pay for access to the tracks or the services.

109.   When the karaoke shows are ongoing, the shows are generally the principal entertainment focus of each Venue Defendant's establishment.

110.   The Venue Defendants derive value from the karaoke shows in the form of increased patronage and increased sales of food and beverages.

111.   Upon information and belief, each of the Venue Defendants has advertised the availability of karaoke shows on its premises, via its own advertising apparatus and as an activity attributable to its business, rather than as adjunct or auxiliary to their businesses.

112.   In order to obtain the infringing karaoke tracks or to supply them at their respective establishments for use by the patrons, the Venue Defendants induce the transportation of the infringing karaoke tracks in commerce, using computer networks and/or public roadways.

113.   Each of the Venue Defendants has had actual knowledge of the foregoing activities being undertaken at its establishment.

114.   Specifically, each of the Venue Defendants was notified by Phoenix by a letter dated July 15, 2016, of the unlicensed, infringing character of the karaoke entertainment services being provided in their establishments.

115.   In the letter, each of the Venue Defendants was offered information about licensing and compliance programs that Phoenix offers to venues that feature karaoke entertainment, along with the opportunity to bring their karaoke entertainment services into compliance with the law and with Phoenix's policies regarding the use of its intellectual property.

116.   In particular, each of the Venue Defendants was offered the opportunity, at no charge, to request, via Phoenix's Safe Harbor program, that Phoenix evaluate the licensing status and needs of its karaoke entertainment provider and to avoid liability as long as the venue took heed of Phoenix's evaluation and acted accordingly.

117.   None of the Venue Defendants took advantage of the Safe Harbor program.

118.   Despite these offers, and despite their knowledge of the unlicensed, infringing character of the karaoke entertainment services being provided in their establishments, none of the Venue Defendants elected to bring their karaoke entertainment services into compliance.

119.   Each of the Venue Defendants has the right to control the means and the details of the process by which its third-party agent(s) accomplish their respective tasks, including, without limitation, controlling the dates and starting and stopping times of shows, determining whether particular content (such as offensive-

language content) is permitted to be played at shows, determining the style and genre of music played at shows, and determining whether the third-party agent is permitted to use the Venue Defendant's equipment (such as television displays, sound equipment, stage, etc.) as part of the shows.

120.   In particular, each of the Venue Defendants has the right to control whether or not the activities occur on its premises.

121.   Despite each of Venue Defendants having knowledge of the infringing character of the activities and ability to control whether those activities occur, none of the Venue Defendants have elected to stop the infringement from occurring.

122.   As such, to the extent that it is not directly liable as an infringer, each of the Venue Defendants is liable as a secondary infringer for the continuing infringement that has occurred and is occurring on its premises.

**D.    The Defendants' pattern of infringing conduct**

123.   The Defendants' conduct as described above with respect to the Sound Choice Marks and, as applicable, to Phoenix's copyrights in Sound Choice-branded audiovisual works, is not isolated to Sound Choice accompaniment tracks, but also extends as part of a large-scale program of infringing activities and piracy of numerous other producers' karaoke tracks, on the same terms.

124. Essentially, the Defendants have built an entire business model and moneymaking scheme premised on a competitive advantage derived from the infringement of the intellectual property rights of others, including Phoenix.

125. The Defendants' activities directly compete with Phoenix's own licensees and Phoenix's wholly owned subsidiary company, SCE, by using identical but unauthorized trademarks in connection with services that are neither authorized nor subject to Phoenix's quality control.

126. The Defendants' wrongful conduct exerts illegitimate and unfair pressure upon the market for karaoke services in this State and judicial district through the unlicensed use of pirated material belonging to Phoenix and to other producers, thereby diminishing the value of licenses and permissions in the hands of Phoenix, its subsidiary, and its licensees.

127. The diminution of the value of licenses encourages or forces karaoke operators to forego licenses in order to compete profitably.

128. Upon information and belief, the Defendants' misconduct has cost Phoenix in excess of $100,000 in revenue from legitimate sources crowded out of the market by their wrongful conduct.

## **FIRST CLAIM FOR RELIEF**
## **TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114(1)**

129.   Each Defendant used a reproduction, counterfeit, or copy of the Sound Choice Marks in connection with the production or distribution of goods and with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks; by providing the Defendant's patrons with access to the goods; or by repeatedly displaying the reproduction, counterfeit, or copy of the Sound Choice Marks during the provision of those services.

130.   Each Defendant's use of the Sound Choice Marks was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

131.   Phoenix did not license any Defendant to manufacture or acquire reproductions, counterfeits, or copies of, or to use, the Sound Choice Marks in connection with the provision of their services or to provide any patrons with access to goods marked with the Sound Choice Marks.

132.   Each Defendant's use of the Sound Choice Marks is likely to cause confusion, or to cause mistake, or to deceive its customers and patrons into believing that the goods to which access is provided are bona fide karaoke accompaniment tracks authorized by Phoenix, and that the services being provided are provided with the authorization of Phoenix.

133.   Each Defendant's acts were willful, knowing, and intentional.

134.   Each Defendant that has hired a third-party agent to supply infringing karaoke tracks and to provide karaoke entertainment services is additionally vicariously liable for the infringing acts of that agent.

135.   Each Defendant's activities constitute the infringement of the federally registered Sound Choice Marks in violation of 15 U.S.C. § 1114(1).

136.   Phoenix has been damaged by each Defendant's infringing activities.

137.   Unless enjoined by the Court, each Defendant's infringing activities as described above will continue unabated and will continue to cause harm to Phoenix.

## SECOND CLAIM FOR RELIEF
## UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)

138.   Each Defendant has supplied karaoke accompaniment tracks marked with the Sound Choice Marks to customers or patrons.

139.   Each Defendant has supplied karaoke entertainment services to customers or patrons, in connection with which the Sound Choice Marks were used in the advertising and performance of the services and not merely as an adjunct to the playing of any particular communicative content contained within karaoke accompaniment tracks.

140.   The use of the Sound Choice Marks is likely to cause confusion, or to cause mistake, or to deceive the customers or patrons into believing, falsely, that

Phoenix manufactured the karaoke accompaniment tracks being supplied or sponsored or approved the Defendant's services and commercial activities.

141.   The presence of the Sound Choice Marks on the goods supplied to the customers or patrons is also likely to cause confusion, or to cause mistake, or to deceive those receiving access to the goods into believing, falsely, that the goods being supplied to them were sold by Phoenix and purchased or otherwise licensed by the Defendant.

142.   Because of each Defendant's wholly unauthorized uses of the Sound Choice Marks in the manner described above, Phoenix was denied revenue from the sale or licensing of authorized goods and services and deprived of control over the use of the Sound Choice Marks.

143.   Because Phoenix has been denied this revenue and control, it has been damaged by each Defendant's uses.

144.   Phoenix is a provider of karaoke entertainment services, directly, through controlled licensees, and through its wholly owned subsidiary SCE.

145.   Each Defendant's activities are part of a program and money-making scheme premised upon the unlicensed use of pirated copies of karaoke accompaniment tracks belonging to Phoenix and other karaoke producers.

146.   Each Defendant's activities in furtherance of this program of infringement have caused a competitive injury to Phoenix, both directly and on the basis of damage to SCE and to Phoenix's licensees.

147.   Each Defendant's activities constitute unfair competition in violation of 15 U.S.C. § 1125(a).

148.   Unless enjoined by the Court, each Defendant's unfair competition activities as described above will continue unabated and will continue to cause harm to Phoenix.

## THIRD CLAIM FOR RELIEF
## COPYRIGHT INFRINGEMENT UNDER 17 U.S.C. § 501
## (AS TO THE BOYTES)

149.   Phoenix's copyrights in the audiovisual works listed in Annex A are valid and subsisting.

150.   The Boytes reproduced or caused to be reproduced each of the works listed in Annex A without Phoenix's permission to do so.

151.   By supplying unauthorized copies of each of the works listed in Annex A to venue customers, the Boytes distributed copies of each of the works listed in Annex A without Phoenix's permission to do so.

152.   Each Defendant's acts as identified above constitute infringement of Phoenix's copyright in the subject audiovisual work.

153.   As a result of these acts of infringement, Phoenix has been damaged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Phoenix prays for judgment against each of the Defendants severally, and that the Court:

A.     Find that each Defendant has committed acts of infringement, including but not limited to counterfeiting, of the federally registered Sound Choice Marks, in violation of 15 U.S.C. § 1114(1);

B.     Find that each Defendant has engaged in unfair competition detrimental to Phoenix in violation of 15 U.S.C. § 1125(a);

C.     Find that the Boytes have committed acts of infringement of Phoenix's copyright in the audiovisual works listed in Annex A, in violation of 17 U.S.C. § 106;

D.     Enter judgment against each Defendant and in favor of Phoenix on all applicable counts;

E.     Award to Phoenix each Defendant's profits and the damages sustained by Phoenix because of that Defendant's conduct in infringing the Sound Choice Marks, or, in the alternative, statutory damages per trademark infringed by counterfeiting, and in any event in an amount not less than $50,000 per Defendant;

F.      Award to Phoenix each Defendant's profits and the damages sustained by Phoenix because of that Defendant's acts of unfair competition under 15 U.S.C. § 1125(a);

G.      Award to Phoenix either its actual damages arising from the Boytes' acts of copyright infringement, or statutory damages, pursuant to 17 U.S.C. § 504;

H.      Award to Phoenix treble, punitive, or otherwise enhanced damages, as available, upon a finding that any Defendant acted willfully in the conduct of its infringement;

I.      Order all computer disks, drives, or other media belonging to each Defendant, which media contain counterfeits of Phoenix's marks or unauthorized copies of works in which Phoenix holds the copyright, to be delivered up or seized for destruction;

J.      Grant Phoenix preliminary and permanent injunctive relief against further infringement of the Sound Choice Marks, further false designations of origin, and further infringement of Phoenix's copyrights by each Defendant, as applicable, specifically including injunctive relief against the making, copying, sharing, distributing, selling, or otherwise using digitized copies of karaoke accompaniment tracks, commercially or otherwise, which tracks are marked with any mark or other designation belong to any person from whom the Defendant has not obtained written

authorization from the owner thereof to make, copy, share, distribute, sell, or otherwise use the digitized copy;

     K.    Award Phoenix its costs of suit and attorney's fees, to the extent not awarded above; and

     L.    Grant Phoenix such other and further relief as justice may require.

Dated: September 29, 2016        Respectfully submitted,

                  /s/Keith A. Vogt
                  *Attorney-in-Charge*
                  Illinois State Bar No. 6207971
                  Southern District of Texas Bar No. 2100435
                  1033 South Blvd., Suite 200
                  Oak Park, Illinois 60302
                  Telephone: 708-203-4787
                  E-mail:  keith@vogtip.com

## ANNEX A

## COPYRIGHT REGISTRATIONS

| Subject Work<br>*Appears on Sound Choice Disc* | Publication Date<br>Registration No. |
|---|---|
| 1, 2, 3, 4 (style of Plain White T's)<br>*Hits Of June 2009 - Vol. 1* | 6/5/2009<br>SR0000640787 |
| America's Suitehearts (style of Fall Out Boy)<br>*Hits Of May 2009 - Vol. 1* | 5/7/2009<br>SR0000646599 |
| Chasing Pavements (style of Adele)<br>*Pop Hits - Vol. 203* | 8/21/2009<br>SR0000674131 |
| The Climb (style of Miley Cyrus)<br>*Hits Of June 2009 - Vol. 1* | 6/5/2009<br>SR0000640787 |
| Gives You Hell (style of The All-American Rejects)<br>*Hits Of April 2009 - Vol. 1* | 4/20/2009<br>SR0000646602 |
| Here Comes Goodbye (style of Rascal Flatts)<br>*Hits of July - Vol. 1* | 7/2/2009<br>SR0000640790 |
| If U Seek Amy (style of Britney Spears)<br>*Hits Of May 2009 - Vol. 1* | 5/7/2009<br>SR0000646599 |
| I'm Yours (style of Jason Mraz)<br>*Hits Of April 2009 - Vol. 1* | 4/20/2009<br>SR0000646602 |
| Just Dance (style of Lady GaGa / Colby O'Donis)<br>*Pop Hits - Vol. 203* | 8/21/2009<br>SR0000674131 |
| Kids (style of MGMT)<br>*Hits of July - Vol. 1* | 7/2/2009<br>SR0000640790 |
| Love Game (style of Lady GaGa)<br>*Hits of July - Vol. 1* | 7/2/2009<br>SR0000640790 |
| Love Lockdown (style of Kanye West)<br>*Pop Hits - Vol. 203* | 8/21/2009<br>SR0000674131 |
| Low (style of Flo Rida)<br>*Pop Hits - Vol. 203* | 8/21/2009<br>SR0000674131 |
| My Life Would Suck Without You (style of Kelly Clarkson)<br>*Hits Of May 2009 - Vol. 1* | 5/7/2009<br>SR0000646599 |

| Subject Work<br>*Appears on Sound Choice Disc* | Publication Date<br>Registration No. |
|---|---|
| Nothin' To Die For (style of Tim McGraw)<br>*Hits Of June 2009 - Vol. 1* | 6/5/2009<br>SR0000640787 |
| Paper Planes (style of M.I.A.)<br>*Pop Hits - Vol. 203* | 8/21/2009<br>SR0000674131 |
| Psychosocial (style of Slipknot)<br>*Hits Of 2009 - Vol. 1* | 3/16/2010<br>SR0000651308 |
| Second Chance (style of Shinedown)<br>*Hits Of May 2009 - Vol. 1* | 5/7/2009<br>SR0000646599 |
| Sex On Fire (style of Kings Of Leon)<br>*Hits Of April 2009 - Vol. 1* | 4/20/2009<br>SR0000646602 |
| Something In Your Mouth (style of Nickelback)<br>*Hits of July - Vol. 1* | 7/2/2009<br>SR0000640790 |
| You Belong With Me (style of Taylor Swift)<br>*Hits Of 2009 - Vol. 1* | 3/16/2010<br>SR0000651308 |
| You Found Me (style of The Fray)<br>*Hits Of April 2009 - Vol. 1* | 4/20/2009<br>SR0000646602 |
| You're Gonna Go Far, Kid (style of The Offspring)<br>*Hits Of 2009 - Vol. 1* | 3/16/2010<br>SR0000651308 |
| You're Not Sorry (style of Taylor Swift)<br>*Hits Of June 2009 - Vol. 1* | 6/5/2009<br>SR0000640787 |

## ANNEX B

## FEDERAL TRADEMARK REGISTRATIONS

| Reg. No. | Mark | Reg. Date |
|---|---|---|
| **Goods/Services** | | |

1,923,448    SOUND CHOICE                                           October 3, 1995
Pre-recorded … compact discs containing musical compositions and compact discs
containing video related to musical compositions
*Renewed December 7, 2004, and August 18, 2015*

2,000,725    SOUND CHOICE & Design (see below)       September 17, 1996
Pre-recorded … compact discs containing musical compositions and compact discs
containing video related to musical compositions
*Renewed November 29, 2006, and April 5, 2016*

4,099,045    SOUND CHOICE                                           February 14, 2012
Conducting entertainment exhibitions in the nature of karaoke shows

4,099,052    SOUND CHOICE & Design (see below)       February 14, 2012
Conducting entertainment exhibitions in the nature of karaoke shows

"SOUND CHOICE & Design" refers to the following display mark:

