United States District Court
Southern District of Texas
**ENTERED**
March 28, 2017
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

PHOENIX ENTERTAINMENT PARTNERS §
LLC, §
§
Plaintiff, §
§
v. §   CIVIL ACTION NO. H-16-2911
§
HERBERT J. BOYTE, *et al.,* §
§
Defendants. §

**MEMORANDUM AND OPINION**

This case brings with it an education on karaoke. The word apparently comes from combining two Japanese words, "kara," which means empty, and "okesutora," or orchestra. Karaoke, or "empty orchestra," is a type of interactive entertainment in which amateur singers, here, customers of bars, restaurants, or clubs, sing along with recorded music and video displays, using a microphone and a public address system. A "karaoke jockey" manages and plays the music and shows the displays, announces the songs, and identifies whose turn it is at the microphone. As this case and other similar lawsuits demonstrate, karaoke is a highly competitive business. This suit is one of hundreds that the plaintiff and its predecessor, a producer and distributor of karaoke accompaniment tracks, has brought around the country invoking the Lanham Act, 15 U.S.C. § 1051 *et seq.*, to challenge the unauthorized copying and performance of its commercial karaoke files as a form of trademark infringement.

In this case, Phoenix Entertainment Partners sued Houston-area bars and two karaoke jockeys, alleging trademark and copyright infringement of karoake tracks created under the Sound Choice brand. (Docket Entry No. 26). Some defendants have moved to dismiss. (Docket Entries

No. 10, 28).  Based on the briefs, the complaint, and the applicable law, the motions to dismiss are granted in part and denied in part.

Phoenix alleges that the defendants infringe its goods marks when they illicitly download and play Sound Choice-branded karaoke tracks.  That is trademark lipstick on a copyright pig.  Recognizing as much, both the Seventh and Ninth Circuits affirmed dismissals of Slep-Tone or Phoenix suits alleging substantially the same goods-mark infringement theories.  *Phoenix Entertainment Partners v. Rumsey*, 829 F.3d 817 (7th Cir. 2016); *Slep-Tone Entm't Corp. v. Wired for Sound Karaoke & DJ Servs., LLC*, 845 F.3d 1246 (9th Cir. 2017).  These well-reasoned opinions are on point and persuasive.  The claims based on copying and performing tracks with the Sound Choice goods marks are dismissed with prejudice and without leave to amend, because amendment would be futile.

These cases apply only to the goods marks.  The claims based on the Sound Choice service marks and copyrights may proceed.

The reasons for these rulings are explained in detail below.

## I.    Background

The complaint allegations, taken as true on this motion to dismiss, are as follows.  Phoenix Entertainment Partners is the successor in interest to Slep-Tone Entertainment Corporation.  Slep-Tone created karaoke tracks under the popular Sound Choice brand.  Compl. ¶¶ 30-31.  Sound Choice karaoke tracks were sold on special compact discs in a "CD+G" or "MP3+G" format.  *Id.* ¶ 31.  The tracks contain both a re-recorded version of a popular song and graphics (the "+G").  *Id.*  The graphics include song lyrics and visual cues for display to the karaoke performer, and an image of the Sound Choice trademark logo.

Sound Choice karaoke tracks are "wildly popular," accounting for more than half of the karaoke tracks played at shows in the United States, including shows at bars like those sued in this case. Their popularity is at least in part due to the high quality of the recordings and the accuracy of the singing cues. *Id.* ¶ 33-35. Phoenix sells, and its predecessor sold, karaoke tracks exclusively in compact disc format, bearing the Sound Choice name and logo. Tracks from the CDs can be remotely "ripped," or downloaded and saved, into a computer hard drive. *Id.* ¶ 36-37. The digital compression required to rip the tracks onto a computer hard drive often results in lower-quality audio and graphics. *Id.* ¶ 38. The ripped tracks still display the Sound Choice trademark when played. *Id.* ¶ 41. This easy electronic duplication has "resulted in the widespread copying and distribution of Sound Choice-branded karaoke tracks," without payment to or permission from Phoenix. *Id.* ¶¶ 42-43.

Phoenix alleges that it owns the copyright to, among others, 24 specific audiovisual karaoke tracks—separate from the copyrights for the underlying songs—set out in the complaint, as well as four federally registered Sound Choice trademarks. *Id.* ¶¶ 46-50; *id.* at Appendixes A and B. Two of the marks cover goods. These goods marks protect the Sound Choice name and logo as a mark appearing on "[p]re-recorded . . . compact discs containing musical compositions and compact discs containing video related to musical compositions." The other two marks cover services. These marks protect the Sound Choice name and logo in connection with "[c]onducting entertainment exhibitions in the nature of karaoke shows." Compl. Appendix B.

Part of Phoenix's business is "licensing . . . the Sound Choice Marks for karaoke accompaniment tracks, . . . licensing the Sound Choice Marks for karaoke entertainment services provided to patrons of commercial customers, and . . . licensing sets of Sound Choice karaoke

accompaniment tracks, all to commercial karaoke operators." *Id.* ¶ 53.  Karaoke jockeys must spend "significant sums of money" to receive a license. *Id.* ¶ 54.  As part of the license agreement, karaoke jockeys who use digital copies of Sound Choice tracks must submit to quality audits to ensure that their copied tracks meet Sound Choice's standards. *Id.* ¶ 55.

Phoenix is also the sole owner of Sound Choice Entertainment, LLC, a Texas company that provides karaoke-entertainment services to venues throughout the United States, including in Texas. *Id.* ¶ 57.  Sound Choice Entertainment directly competes with other karaoke-entertainment service providers in the karaoke jockey market.

The defendants are karaoke jockeys and bars that hire jockeys to provide entertainment for their patrons.  Herbert and Jodie Boyte are karaoke jockeys who own and operate Karaoke Houston, a business that provides karaoke entertainment at bars and restaurants around Houston.  The Boyte karaoke system uses computer software to access and play karaoke tracks ripped from CDs and copied to a hard drive.  A "substantial number" of the tracks that the Boytes or their employees play at the venues where they perform bear the Sound Choice logo and brand.  The Boytes's karaoke shows also included renditions of the 24 works for which Phoenix owns the copyright. *Id.* ¶ 77. The Boytes did not purchase any Sound Choice disks or license.  "[M]any, if not most" of the Sound Choice-branded tracks they played were created by downloading the tracks from illicit filesharing sites or other unauthorized copying. *Id.* ¶¶ 58-64.  The Boytes display the Sound Choice marks "dozens of times over the course of a typical four-hour karaoke show." *Id.* ¶ 71.  Phoenix alleges that this "frequent, repeated display" of the Sound Choice trademark is likely to cause karaoke consumers to assume that the Boytes's karaoke operation is affiliated with Phoenix, or that Phoenix sponsors or approves of their services. *Id.* ¶ 72-76.

4

Koert William Knights operates "Mr. Karaoke," a business similar to the Boyte business, "Karaoke Houston."  Phoenix alleges that Knights, like the Boytes, regularly plays Sound Choice-branded karaoke tracks at his shows, without purchasing or licensing those tracks.  Knights is also alleged to have ripped the tracks, without paying or securing permission from Phoenix. *Id.* ¶¶ 83-89. Phoenix alleges that Knights's shows are likely to confuse customers about the origin of the karaoke tracks and about Knights's relationship with Phoenix.  *Id.* ¶¶ 96-100.

The rest of the defendants are venues that hire either the Boytes or Knights as karaoke jockeys, providing karaoke services to entice patrons to come to the bar and purchase food and, even better, drinks.  *Id.* ¶¶ 103-132.  Phoenix notified each bar in a letter dated July 15, 2016 that the karaoke jockeys it hired were playing unlicensed, infringing karaoke tracks at all the bars where they played.  *Id.* ¶ 124.

Phoenix asserts claims against all the defendants under 15 U.S.C. § 1114(1) for infringing its registered trademarks, and under 15 U.S.C. § 1125(a) for unfair competition.  Phoenix also asserts a copyright-infringement claim against the Boytes under 17 U.S.C. § 501.

## II.     The Applicable Legal Standards

### A.     Rule 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2).  To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570; *see also Elsensohn v. St. Tammany Parish*

5

*Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008).  In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court elaborated on the pleading standards discussed in *Twombly*.  The Court explained that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).  *Iqbal* explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  (citing *Twombly*, 550 U.S. at 556).

"[I]n deciding a motion to dismiss for failure to state a claim, courts must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint."  *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996).  A court may "consider documents integral to and explicitly relied on in the complaint, that the defendant appends to his motion to dismiss, as well as the full text of documents that are partially quoted or referred to in the complaint."  *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 882 (S.D. Tex. 2001) (internal quotation marks omitted). Consideration of documents attached to a defendant's motion to dismiss is limited to "documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim."  *Scanlan v. Tex. A & M. Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).  In securities cases, courts may take judicial notice of the contents of public disclosure documents that the law requires be filed with government agencies, such as the SEC, and that are actually filed with the agency.  *Lovelace*, 78 F.3d at 1018 n.1.  The court may consider such extrinsic materials as matters of public record without converting the motion into one seeking summary judgment.  *See Funk v. Stryker Corp.*, 631 F.3d 777, 780 (5th Cir.2011); *Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 193

n.3 (5th Cir. 1988) (quoting 5 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1366);

*Jathanna v. Spring Branch Indep. Sch. Dist.*, No. CIV.A. H-12-1047, 2012 WL 6096675, at *3 (S.D.

Tex. Dec. 7, 2012).

### B.      The Lanham Act

The Lanham Act provides for civil liability for "[a]ny person who . . . uses in commerce any

word, term, name, symbol, or device, or any combination thereof, or any false designation of origin

. . . which is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her

goods, services, or commercial activities by another person."  15 U.S.C. § 1125.  To prevail on

trademark-infringement and unfair-competition claims under the Lanham Act, a plaintiff must

establish ownership of a legally protectable mark and infringement of that mark by demonstrating

a likelihood of confusion.  *Bd. of Supervisors for La. State Univ. Agric. and Mech. College v. Smack*

*Apparel Co.*, 550 F.3d 465, 474 (5th Cir. 2008).  When a mark is counterfeit, likelihood of confusion

may be presumed.  *See Choice Hotels Intern., Inc. v. Patel*, 940 F. Supp. 2d 532, 540 (S.D. Tex.

2013); *see also Paulsson Geophysical Servs. v. Sigmar*, 529 F.3d 303, 310–311 (5th Cir. 2008) (no

error in not analyzing the digits of confusion because the defendant "used the exact same mark");

*Petro Franchise Sys., LLC v. All Am. Props., Inc*., 607 F. Supp. 2d 781, 788 (W.D. Tex. 2009) ( "a

district court may confine its digits-of-confusion analysis to the determination that the marks used

by the allegedly infringing party are the exact marks owned by the plaintiff and, if they are, find that

confusion is likely"); *Microsoft Corp. v. Software Wholesale Club, Inc*., 129 F. Supp. 2d 995, 1007

n.11 (S.D. Tex. 2000) (likelihood of confusion is clear when marks are counterfeit).

In addition to direct trademark infringement, the Lanham Act provides for two forms of

secondary liability.  A defendant can be vicariously liable for trademark infringement, but the

standard is difficult to meet. *Clearline Technologies Ltd. v. Cooper B-Line, Inc.*, 871 F. Supp. 2d 607, 613 (S.D. Tex. 2012). "Courts have strictly applied the test for vicarious trademark liability based on agency principles, and, unlike vicarious copyright liability, 'courts do not recognize vicarious liability in the trademark context based on ability to supervise in combination with a financial interest." *Id*. at 613–14 (quoting *United States v. Washington Mint, LLC*, 115 F.Supp.2d 1089, 1106 (D. Minn. 2000)). Vicarious liability for trademark infringement requires "a finding that the defendant and the infringer have an apparent or actual partnership, have authority to bind one another in transactions with third parties or exercise joint ownership or control over the infringing product." *Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1150 (7th Cir. 1992).

A defendant can also be secondarily liable for contributory infringement. Contributory infringement is "intentionally causing or knowingly facilitating the infringement of the plaintiff's mark by a third party." *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1240 (10th Cir. 2013) (citing *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844 (1982)). There must be underlying direct infringement by someone other than the secondarily liable defendant in order to hold that defendant liable on a contributory infringement theory. *Id.*; *see also* 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25:17 (4th ed.).

The Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), is at the center of the parties' briefing. The case addresses the difference between trademark and copyright claims, holding that trademark owners cannot shove a copyright-claim peg into a trademark-claim hole. "[R]eading the phrase 'origin of goods' in the Lanham Act in accordance with the Act's common-law foundations (which were *not* designed to protect originality

or creativity), and in light of the copyright and patent laws (which *were*)," the Court held that "the phrase refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003).

In *Dastar*, the Fox film studio had produced a television series loosely based on then-Supreme Allied Commander Dwight Eisenhower's World War II memoir.  After the copyright on the series expired, Dastar repackaged the public domain materials without Fox's trademark and sold the material as a film.  Because Fox's copyright had expired, it could not sue for copyright infringement.  Instead, it sued under the Lanham Act, alleging infringement for Dastar's misrepresentation of the "origin" of the work as its own.

The Supreme Court rejected Fox's trademark claim.  It reasoned that the Lanham Act used the word *origin* not to refer to a work's creator—who would be protected by copyright laws—but to the producer of the work.  Because Dastar had technically produced the slightly revised film out of materials in the public domain, it was not a misrepresentation under the Lanham Act to remove Fox's trademark and replace it with Dastar's.

### C.    The Copyright Act

"To prove copyright infringement a party must show that '(1) he owns a valid copyright and (2) the defendant copied constituent elements of the plaintiff's work that are original.'" *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012) (quoting *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 367 (5th Cir. 2004) *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010)).  "A certificate of registration, if timely obtained, is prima facie evidence both that a copyright is valid and that the registrant owns the copyright."

*Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004). "[A] side-by-side comparison must be made between the original and the copy to determine whether a layman would view the two works as 'substantially similar.'" *Id.* at 142 (citation omitted). "[N]ot all copying is legally actionable. To support a claim for copyright infringement, the copy must bear a substantial similarity to the protected aspects of the original." *1 Peel & Co. v. The Rug Market*, 238 F.3d 391, 398 (5th Cir. 2001).

## III.   Analysis

### A.   The Goods Marks

As noted, two circuits have extensively considered similar claims repeatedly asserted in serial lawsuits filed by Phoenix and its predecessors-in-interest. These opinions correctly and persuasively extend the principles that the Supreme Court identified in *Dastar* to the karaoke context. The opinions make clear that, as a matter of law, there is no possibility of consumer confusion over the goods mark display. The "tangible goods" at issue in Phoenix's goods mark claims can only be the illicitly acquired digital files containing the Sound Choice tracks. A bar patron does not see these digital files. Instead, they see "only the performance of the digital file. So far as the patron is concerned, the content could be played form a compact disc, the . . . karaoke hard drive, or from an internet streaming source." *Rumsey*, 829 F.3d at 828-29. The patrons may believe—accurately—that they are viewing and listening to content created by Sound Choice, but that is not the relevant confusion. Bar patrons "have no interaction with the medium from which the tracks are played"; there can be no confusion "about the source of the tangible good." *Id.* at 829.

Nor does the fact that the patrons may see the Sound Choice mark in an audiovisual display change the analysis as to these goods marks. As the Seventh Circuit observed, when the copyright

10

on a classic film runs out, anyone is free to copy, distribute, and display the film without deleting the studio logos that are displayed before the credits roll.  *Id.* at 829-30.  Patrons at a classic movie night, looking upon Leo the Lion's familiar and magnificent head and hearing his roar, are not confused into thinking that their local movie house purchased the film rolls directly from Metro-Goldwyn-Mayer.  The "routine display" of the Sound Choice goods marks "during the performance of the tracks" is not trademark infringement.  *Id.* at 830.

Phoenix argues that this court should disregard the Seventh and Ninth Circuits's holdings on the goods marks, but the arguments are unpersuasive.  Phoenix notes that the defendants in *Rumsey* were bar owners who supplied their own karaoke systems rather than hiring outside karaoke jockeys.  But Phoenix does not explain why this distinction makes a difference, and there is no apparent reason it would.  Phoenix argues that *Rumsey* is contrary to the Supreme Court's *Dastar* decision, because the Supreme Court said that, if Dastar had left Fox's trademarks onscreen in the videos it produced, Dastar would have been liable.  But it is Phoenix's argument that is contrary to *Dastar*.  The part of the opinion Phoenix refers to does not approvingly state that leaving the marks in place would have subjected Dastar to Lanham Act liability.  Instead, the Court disapprovingly noted that this theory would create an impossible double-bind for users of uncopyrighted material.  The users would get sued if they left the original creator's trademarks in their repackaged version—even if the repackaging was lawful—and would also get sued if they took the trademarks out.  *Dastar*, 539 U.S. at 36.  Phoenix's version of Dastar's failed attempt to assert trademark rather than copyright claims fares no better.

Phoenix asserts that its allegations that it has a rigorous quality-control program and that copying reduces the quality of the karaoke tracks show that it is not really attempting to assert a

copyright claim.  The Seventh Circuit persuasively rejected this argument, because playing karaoke tracks in a nightclub is not passing-off a tangible good in the marketplace.  *Rumsey*, 829 F.3d at 831. "[T]he defendants are not selling compact discs with karaoke tracks and billing them as genuine [Sound-Choice] tracks, in the way a street vendor might hawk knock-off Yves Saint Laurent bags or Rolex watches . . . ."  *Id.*

The basis of Phoenix's action is that the defendants copied Sound Choice-branded karaoke tracks.  The Supreme Court and two appellate courts have firmly rebuffed virtually identical attempts to assert a trademark-infringement claim based on the goods marks.  Because there is no direct infringement, there is no secondary infringement.  Phoenix's claims based on the goods marks are dismissed with prejudice because any amendment will be futile.  Because Phoenix does not have a viable claim on the Sound Choice goods marks, the claims are dismissed with prejudice as to all defendants.

### B.    The Service Marks

The analysis as to the service marks is different.  Phoenix alleges that its wholly owned subsidiary, Sound Choice Entertainment, LLC, provides karaoke-jockey services throughout the United States and specifically in Texas, using Sound Choice branding to identify and advertise its shows.  Phoenix also plausibly alleges that, if the Sound Choice logos are displayed during karaoke shows, patrons might be confused about whether the karaoke jockey is affiliated with Sound Choice's karaoke-jockeying service.  These claims are not controlled by *Dastar*, *Rumsey*, or *Wired for Sound*, and the defendants' arguments for dismissal are unpersuasive.

*Rumsey* and *Wired for Sound* dealt only with the Sound Choice brand-name and logo-design registration as applied to physical CDs containing karaoke tracks.  These goods trademark cases do

12

not extend to the service marks at issue.  As noted above, Phoenix plausibly alleges that Sound Choice Entertainment actively competes in the karaoke-jockey market and uses the Sound Choice name and logo to advertise and brand its karaoke shows.  The relevant confusion is different.  Displaying the Sound Choice logo at the beginning of a digital karaoke file could not plausibly confuse a bar patron about the source of the file.  But displaying the Sound Choice logo throughout the course of a multi-hour karaoke show in a bar could very well confuse the customer—whether a bar patron or owner, the immediate purchaser of the jockeys' services—about whether the karaoke jockey was affiliated with Sound Choice Entertainment, Phoenix's karaoke-jockeying subsidiary.  That confusion could lead to a loss of goodwill or reputation for the Sound Choice Entertainment karaoke-jockeying brand if the quality of the show fell short of the Sound Choice brand's standards.

The defendants' arguments are not persuasive.  The karaoke jockeys and certain venues argue that the court in *Rumsey* held that displaying a trademark could not cause confusion about whether Sound Choice sponsored the performance of the creative content of the karaoke tracks.  But in *Rumsey*, unlike here, there were no allegations about Sound Choice also operating a competing karaoke-jockey service using the Sound Choice logo to advertise and brand its shows.  *Rumsey*'s reasoning makes good sense on its facts.  In that case, there was no plausible basis to infer that a person seeing and hearing a karaoke performance would assume that Sound Choice, a trademarked producer of physical compact discs containing karaoke tracks, was endorsing that jockey's performance of the creative contents of one of the CD tracks.  The factual allegations about the performances are different in the context of the service marks claims.  The allegations are that Sound Choice also directly competes with the karaoke jockey defendants in the Texas market.  It is plausible that people viewing the repeated display of the Sound Choice logo might be confused

13

about whether Sound Choice Entertainment was the company putting on that evening's karaoke show.

The defendants' own analogy makes the point. The defendants argue that when Disney released the movie *Frozen*, many theaters "played the film several times a day on multiple screens," displaying Disney's trademark castle-and-fireworks logo. As the defendants assert, no one would be confused into thinking that Walt Disney Pictures sponsored the local theater, or that the local theater had a direct connection to Disney. Walt Disney Pictures is not in the theater-operation business, and the plaintiff's allegations require a different analogy. If Disney had a chain of theaters branded with its trademark logo and the defendant's theater, without permission, repeatedly displayed the Disney logo every time it played a certain movie, confusion could well arise. That is more similar to what the plaintiffs allege here.

The defendants also argue that any confusion is not among the relevant consumers and that Phoenix has not pleaded a plausible damages theory. The first argument stems from the fact that, in one sense, the bar patrons—who would likely be confused if karaoke jockeys unrelated to Sound Choice display Sound Choice branding when playing bootleg tracks—are not Phoenix's customers. Instead, Phoenix's immediate customers for the (here irrelevant) goods marks are karaoke jockeys, and customers for the service marks as used by Sound Choice Entertainment are the venues that hire the karaoke jockeys.

This argument is appealing at first blush. Part of the likelihood-of-confusion analysis requires the court to consider and compare the plaintiff's and defendant's customer bases and market categories. *E.g.*, *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, No. 16-20046, — F.3d —, 2017 WL 1031305, at *6 (5th Cir. Mar. 16, 2017). But that facial appeal quickly dissolves. The

reason is illustrated by a comparison to another activity associated with bars: pub trivia. In addition to many independent and in-house "quizmasters," there are two major multistate operators who contract with bars and restaurants to provide a quizmaster and several rounds of trivia questions, enabling bars not otherwise equipped to provide their own trivia competitions to capitalize on the increased turnout and sales that the popular activity brings. Boston-based *Stump! Trivia* and Denver-based *Geeks Who Drink* directly and vigorously compete in several major markets.[1] Each company has a distinctive style, brand logo, and associated imagery. Trivia enthusiasts often strongly prefer one operator to the other.

Under the defendants' theory, a *Stump! Trivia* quizmaster who decked the walls of a bar with the *Geeks Who Drink* logo during a quiz would not be infringing a trademark unless the bar owner was confused about which operator was providing the services. But the bar owner would not be confused; indeed, she was the one who hired *Stump! Trivia* in the first place. The bar's patrons, however, might be confused and presume an affiliation between that evening's quizmaster and *Geeks Who Drink*, potentially harming *Geeks Who Drink* by associating it with a different, and perhaps lower-quality, trivia-quiz service. But under the defendants' theory, the bar patrons' confusion would not matter at all. The law does not support this result. The relevant group of those who would likely be confused by the use of the service mark is not as narrow as the defendants argue. Trademark actions can proceed on the basis of confusion in categories of consumers that are considerably broader than the immediate potential purchasers of a service. 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §§ 23:5-23:8. And, critically, confusion in the minds of

---

[1] *E.g.*, Billy Baker, *The War for Boston's Bar Trivia*, BOSTON GLOBE (Dec. 3, 2012), https://www.bostonglobe.com/metro/2012/12/03/the-war-for-boston-bar-trivia/GxjVmzni2GqNP HIS9uzJBN/story.html

those who influence the immediate consumer's purchasing decisions is actionable.  *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1216 & n.10 (9th Cir. 2012); *Mid-State Aftermarket Body Parts, Inc. v. MQVP, Inc.*, 466 F.3d 630, 634 (8th Cir. 2006); *Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.*, 376 F.3d 8, 10 (1st Cir. 2004).

Here, it does not matter if the only people likely confused are bar patrons who see and hear the karaoke shows.  While the bars themselves are the immediate customers of a karaoke jockey's services—the bars select, hire, and pay the jockeys—bar patrons' karaoke-consumption preferences are among the primary drivers of those decisions.  The bars attempt to identify and cater to their customers' known preferences to keep existing customers and win new ones.  A karaoke jockey's recognizability, reputation, and goodwill among the bar patrons influences the bars' karaoke-jockey hiring decisions.  Unauthorized use of Sound Choice's service marks in karaoke shows could plausibly confuse the bar patrons by unfairly trading on Sound Choice Entertainment's brand identity and impairing Sound Choice Entertainment's ability to differentiate its services from the competition.  Phoenix has plausibly alleged facts supporting this kind of confusion.

The defendants' related argument that Phoenix has not pleaded a plausible damages theory is not convincing.  The complaint contains specific factual allegations that the service-mark infringement harms Sound Choice Entertainment by creating unfair competitive pressures, and the facts pleaded support a reasonable inference that Phoenix is harmed.  While Phoenix's pleading on the surviving claims about the defendants' specific infringement of the service marks and the resulting harms to Sound Choice Entertainment is not a model of detail or clarity—and amendment to align the pleadings more closely to the permissible claims is welcome—the allegations are sufficient to survive the motion to dismiss.

16

In sum, the complaint adequately alleges direct infringement of the Sound Choice service marks by the karaoke jockeys. They are alleged to have regularly displayed the Sound Choice logo without authorization during their karaoke shows, potentially confusing customers about their affiliation with Sound Choice Entertainment. The complaint also adequately alleges contributory infringement by each of the venue defendants. The complaint alleges that each venue defendant induced Knights or the Boytes to put on infringing karaoke shows, and that each has actually known of the infringement since at least July 2016, when Phoenix sent each venue a demand letter.

This surviving trademark claim is narrower than the claim for the goods marks. Phoenix's damages are limited to the period since the defendants learned or should have learned of the infringement, and Phoenix can only recover for harm that it can tie to infringement of the service marks.

### C.    The Copyright Claims

The Boytes devote one paragraph to arguing that the complaint does not state a claim against them for copyright infringement. It is unpersuasive. The complaint alleges that Phoenix owns a set of copyrights, and that the Boytes copied and displayed the copyrighted works without permission. Compl. ¶¶ 78-82, 159-163. The copyright claims are adequately pleaded and may proceed.

## IV.    Conclusion

The plaintiff's allegations that the defendants infringed their goods trademarks are dismissed with prejudice. The motion to dismiss is otherwise denied. The plaintiff's claims arising from the service marks may proceed on the basis described above. The plaintiff's copyright claims are adequately pleaded and may proceed. If the plaintiff wishes to file an amended complaint setting out in more detail its allegations about the service marks, the amended complaint must be filed by

April 28, 2017.

SIGNED on March 28, 2017, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge

18